**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**MARSHALL DIVISION**

| | | |
|---|---|---|
| REMBRANDT WIRELESS TECHNOLOGIES, LP, | § § § | |
| Plaintiff, | § § | Case No. _____ |
| v. | § § | |
| APPLE INC., | § § | **Jury Trial Requested** |
| Defendant. | § § § § § § § § § | |

**REMBRANDT WIRELESS TECHNOLOGIES LP'S**
**COMPLAINT FOR PATENT INFRINGEMENT**

Plaintiff Rembrandt Wireless Technologies LP ("Rembrandt" or "Plaintiff") hereby submits this Complaint against Defendant Apple Inc. ("Apple") and states as follows:

**THE PARTIES**

1.      Rembrandt is a Virginia limited partnership, having a principal place of business at 401 City Ave., Suite 900, Bala Cynwyd, Pennsylvania 19004.

2.      Rembrandt is the assignee and owner of the patents at issue in this action: United States Patent No. 8,457,228 ("the '228 Patent") and United States Patent No. 8,023,580 ("the '580 Patent").

3.      Rembrandt is informed and believes, and on that basis alleges, that Apple is a California corporation with its principal place of business at 1 Infinite Loop, Cupertino,

1

California 95014.   Apple may be served with process through its registered agent, CT Corporation System (C0168406), 818 West Seventh Street, Suite 930, Los Angeles, CA 90017.

## JURISDICTION AND VENUE

4.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1338(a) because this action arises under the patent laws of the United States, 35 U.S.C. §§ 101 *et seq.*

5.     The Court has personal jurisdiction over Defendant, including because Defendant has minimum contacts within the State of Texas; Defendant has purposefully availed itself of the privileges of conducting business in the State of Texas; Defendant regularly conducts business within the State of Texas; and Plaintiff's cause of action arises directly from Defendant's business contacts and other activities in the State of Texas, including at least by virtue of Defendant's infringing systems, devices, and methods, which are at least sold, practiced, and/or used in the State of Texas. Further, this Court has general jurisdiction over Defendant, including due to its continuous and systematic contacts with the State of Texas. Further, on information and belief, Defendant is subject to the Court's jurisdiction, including because Defendant has committed patent infringement in the State of Texas.

6.     Venue is proper in this federal district pursuant to 28 U.S.C. §§1391(b)-(c) and 1400(b).  Without limitation, on information and belief, Defendant has regular and established places of business in this District, and in Texas, and at least some of its infringement of the patents-in-suit occurs in this District, and in Texas.

7.     Without limitation, on information and belief, venue is proper in this District because Defendant has physical places from which its business is conducted within this District comprising Apple stores, including at 6121 West Park Boulevard in Plano, Texas and 2601

2

Preston Road in Frisco, Texas; the business conducted at such places is steady, uniform, orderly, and/or methodical, and is settled and not transient, including, but not limited to, distribution, sales, and/or offers for sale of infringing products. On information and belief, Defendant also has Apple Stores in multiple locations throughout the state of Texas, and it has significant corporate facilities in Austin, Texas as well. Further, on information and belief, Defendant is subject to venue in this District, including because Defendant has committed patent infringement in this District. Pursuant to 35 U.S.C. § 271, Defendant infringes the patents-in-suit by the infringing acts described herein in this District. Further, Defendant solicits and induces customers/users in this District, including via its stores and website at www.apple.com. On information and belief, Defendant has customers/users who are residents of this District and who purchase, acquire, and/or use Defendant's infringing products in this District.

8.    The patents accused of infringement in this lawsuit, US Patent Nos. 8,457,228 and 8,023,580, were previously asserted in this District against Samsung Electronics Co., Ltd., Samsung Electronics America, Inc. and Samsung Telecommunications America, LLC.  As part of that lawsuit, this Court construed the meaning of certain terms and phrases from those patents, and ultimately conducted a jury trial, during which both of those patents were found to be valid and infringed.  After extensively reviewing the post-trial motions, this Court denied Samsung's motions for judgment as a matter of law, and its request for a new trial, and entered Judgment in favor of the patent owner, Rembrandt.  That liability Judgment and the underlying claim construction was affirmed by the U.S Court of Appeals for the Federal Circuit.  Given this history, this Court has significant knowledge regarding the asserted patents, and principles of judicial economy further support venue in this Judicial District.

## INFRINGEMENT OF U.S. PATENT NO. 8,457,228

9.      On June 4, 2013, United States Patent No. 8,457,228 was duly and legally issued for inventions entitled "System and Method of Communication Using at Least Two Modulation Methods."  The '228 Patent claims priority back through a string of continuation applications to US Application No. 09/205,205, which was filed on December 4, 1998, and to Provisional Application No. 60/067,562, filed on December 5, 1997.  Thus, each of the asserted claims of the '228 Patent are entitled to a priority date of December 5, 1997.  The '228 Patent expired on December 4, 2018, but Rembrandt is entitled to damages for infringement that occurred prior to the expiration of the '228 Patent.  Rembrandt was assigned the '228 Patent and continues to hold all rights and interest in the '228 Patent, including the right to recover damages for past infringement.  A true and correct copy of the '228 Patent is attached hereto as Exhibit A.

10.     According to the '228 Patent, prior master/slave systems could only communicate when all network devices used a single common type of modulation method. *See* '228 Patent at 1:29-67, 3:64-4:5. Thus, if a slave using an additional type of modulation method were added to the network, the new slave could not easily communicate with the master using the different modulation type because it would not be compatible with the common type of modulation method. *Id.*  Annotated figure 1 of the '228 Patent shows a master/slave system, where all devices in the network communicate using only a single common type of modulation method (such as the amplitude modulation used by AM radio), even though some of the devices may be capable of communication via other types of modulation methods:



**FIG. 1**
**Prior Art**

11.      The master/slave concept is described in the '228 Patent at col. 3, line 64-col. 5, line 7, with reference to Fig. 2.  Briefly, Fig. 2 discloses a polled multipoint master/slave system. At the beginning of a session, the master established a common modulation type for communication with all its slaves (sequence 32 in Fig. 2). All slaves were identical in that they shared a common modulation with the master. The master then communicated with its slaves, one at a time, by sending a training sequence with the address of the slave with which it wants to communicate, followed by data, and finally a trailing sequence to end the communication (sequences 34-38 in Fig. 2). A slave could not initiate a communication, but, if the slave were polled by the master, it could respond to the master in a similar fashion (sequences 42-46 in Fig. 2). When the master had completed its communications with the first slave, it could then communicate with a second slave using the same negotiated common modulation (sequences 48-54 in Fig. 2).



12.     In the context of the master/slave system described above, inventor Gordon Bremer created "a system and method of communication in which multiple modulation methods are used to facilitate communication among a plurality of modems in a network, which have heretofore been incompatible." '228 Patent at 2:20-23. Mr. Bremer solved the problem with his claimed master/slave communication system in which slaves can seamlessly communicate over a network through a master using different types of modulation methods, thereby permitting

selection of the modulation type best suited for a particular application. '228 Patent at 2:27-3:14, 5:32-46.

13.    The claimed invention of the '228 Patent is further described with reference to Figure 2 and in Figures 3-8 and the written description. Specifically, Figures 3 and 4 show block diagrams of the master transceiver and tributary transceivers, while Figure 5 shows a ladder diagram illustrating the operation of those transceivers. Figures 6 and 7 show state diagrams for exemplary tributary transceivers. Figure 8 shows a signal diagram for exemplary transmissions.

14.    Annotated FIG. 4 shows an embodiment of the patented technology where some devices in the network communicate using one type of modulation method (e.g., amplitude modulation used by AM radio), while other devices communicate using a different type of modulation method (e.g., the frequency modulation used by FM radio):



FIG. 4

'228 Patent at 6:4-13. Such a system provides for greater efficiency, seamless communication with all devices, backward-compatibility, and decreased costs. *Id.* at 3:9-14; *see also id.* at 2:1-18, 5:32-46.

15.    Annotated FIG. 8 shows two communications intended for different slaves. The first communication 170 uses a first type of modulation method for both the initial training signal

7

and the subsequent data signal, while communication 172 uses the first type of modulation method for the training signal and the second type of modulation method for the data signal:



'228 Patent at Fig. 8, 4:45-48, 4:66-5:1. Information in the training signal indicates whether there will be an impending change from the first type of modulation method to the second type of modulation method. *Id.* (training signal includes "notification of change to Type B" modulation method).

16.    Mr. Bremer's solution is captured and claimed in his seamless "switches" from one modulation type to another and is described with reference to Fig. 5:



FIG. 5

17.    With reference to FIG. 5, for the Master ("Master Type A and B 64") to communicate with a Type A trib ("Trib 1 Type A 66a") using a negotiated first modulation type A method in the normal fashion, the Master transmits a "first message" (sequences 126, 132, 134). The "first message" includes (i) "first information" (training sequence 126) modulated according to the first modulation type A method and (ii) "second information" (transmission sequence 132) modulated according to the first modulation type A method and including data

9

intended for the Type A trib. The "first information" includes first message address information that is indicative of the Type A trib being an intended destination of the "second information." '228 Patent at 7:11-13 ("a training sequence 126 in which an address of a particular type A trib 66a is identified").

18.    For the Master ("Master Type A and B 64") to communicate with a Type B trib ("Trib 2 Type B 66b") using a second modulation type B method, the Master transmits a "second message" (sequences 106, 108, 114). The "second message" includes "third information" (training sequence 106) modulated according to the first modulation type A method and including information that is indicative of an impending change in modulation to the second modulation type B method. '228 Patent at 6:27-30 ("To switch from type A modulation to type B modulation, master transceiver 64 transmits a training sequence 106 to type A tribs in which these tribs are notified of an impending change to type B modulation."). The "second message" also includes "fourth information" (transmission sequence 108) that is transmitted after transmission of the "third information," is modulated according to the second modulation type B method, and includes data intended for the Type B trib. '228 Patent at 6:32-36 ("After notifying the type A tribs 66a of the change to type B modulation, master transceiver 64, using type B modulation, transmits data along with an address in sequence 108, which is destined for a particular type B trib 66b."). In addition, the "second message" includes second message address information that is indicative of the Type B trib being an intended destination of the fourth information. *Id.*

19.    The specification of the '228 Patent describes the claimed switches as follows:

"To switch from type A modulation to type B modulation, master transceiver 64 transmits a training sequence 106 to type A tribs 66a in which these tribs are notified of an impending change to type B modulation.... After notifying the type A tribs 66a of the change to type B modulation, master transceiver 64, using type B modulation, transmits

data along with an address in sequence 108, which is destined for a particular type B trib 66b….” [Col. 6, ll. 27-36.]

"If, however, master transceiver transmits a training sequence in which the type A tribs 66a-66a are notified of a change to type B modulation as indicated by sequence 106, then a transition is made to state 124 where all type B transmissions are ignored until a type A modulation trailing sequence (e.g., sequence 114) is detected. Upon detecting the type A trailing sequence, a type A trib 66a returns to state 122 where it awaits a training sequence.” [Col. 7, ll. 3-10.]

"To initiate a communication session with a type A trib 66a, master transceiver 64 transmits a training sequence 126 in which an address of a particular Type A trib 66a is identified. The identified Type A trib 66a recognizes its own address and transitions to state 128 to receive data from master transceiver 64 as part of sequence 132.” [Col. 7, ll. 11-16.]

20.     The technology recited in the claims of the '228 Patent provides an inventive concept and does not claim an abstract idea.  Due to the inventive combination of elements, the claimed inventions achieve many benefits over prior art systems and methods, including the benefits noted above (*i.e.*, greater efficiency, seamless communication with all devices, backward-compatibility, and decreased costs). '228 Patent at 3:9-14; *see also id.* at 2:1-18, 5:32-46.

21.     The claimed inventive concepts greatly enhance and facilitate technological systems, architectures, and methods through the use of a master communication device in a master/slave relationship with other slave communication devices.  The master communication device transmits messages with particular sequences using two different types of modulation methods to facilitate communication between different type slave devices.  The technology recited in the claims of the '228 Patent improves the functioning of computer devices and improves over existing technological processes, including with respect to master-slave communication systems that implement different types of modulation methods.

22.     The '228 Patent describes systems and methods that solved technical problems. Those problems included the ability to communicate in a master-slave environment amongst devices that implement different families of modulation techniques.   These problems also included backwards compatibility with older devices using different types of modulation.

23.     The technological improvements described and claimed in the '228 Patent were not conventional or generic at the time of their invention, but rather required novel and non-obvious solutions to problems and shortcomings in the art at the time.   The inventions claimed in the '228 Patent also cover more than just the performance of well-understood, routine or conventional activities known in the art.   For example, '228 Claim 21 is directed to a particular master communication device that can communicate with slave devices using different families of modulation techniques.

24.     The '228 Patent claims inventions that provide technological solutions to technological problems.   As disclosed above, the written description of the '228 Patent describes in technical detail each of the elements of the claims, including a master device that can communicate with slave devices using different types of modulation methods according to particular sequences of messages.

25.     The claims of the '228 Patent are not directed to basic tools of scientific and technological work, fundamental economic practices, or the use of an abstract mathematical formula.   Rather, the claims are directed to a master communication device that can communicate with slave devices (which implement entirely different families of modulation techniques) using particular sequences of messages containing different types of modulation methods.

26.    The '228 Patent does not preempt any abstract idea or otherwise preempt anything that would render them unpatentable.  For example, one is free to practice the prior art of record. The '228 claims do not improperly inhibit further discovery by tying up any building blocks of human ingenuity or technological work.

27.    The '228 Patent claims cannot be practiced by a human alone.   Indeed, master/slave communication systems using different types of modulation methods exist only in the context of wireless communication devices.

28.    Upon information and belief, Apple has infringed directly and indirectly and continues to infringe directly and indirectly claim 21 of the '228 Patent.  The infringing acts include, but are not limited to, the manufacture, use, sale, importation, exportation, and/or offer for sale of products practicing any of the following Bluetooth specifications that support Enhanced Data Rate ("EDR"): Version 2.0 + EDR, Version 2.1 + EDR, Version 3.0 + HS, Version 4.0 + LE, Version 4.1, Version 4.2, or version 5 (collectively, the "Bluetooth EDR Specifications").   Such Apple products that support one or more of the Bluetooth EDR Specifications are hereinafter referred to as the "Apple Bluetooth EDR Products."

29.    Apple's Bluetooth EDR Products include but are not limited to the: iPhone XR; iPhone XS; iPhone XS Max; iPhone X; iPhone 8, iPhone 8 Plus; iPhone 7; iPhone 7 Plus; iPhone SE; iPhone 6; iPhone 6 Plus; iPhone 5; iPhone 5S; iPhone 5C; iPhone 4; iPhone 4S; iPhone 3G; iPhone 3GS; iPad Pro (3rd Generation); iPad (2018); iPad Pro (2nd Generation, 10.5" and 12.9"); iPad (2017); iPad Pro (1st Generation, 9.7" and 12.9"); iPad Air 2; iPad Air; iPad 4th Generation; iPad 3rd Generation; iPad 2; iPad; iPad mini 4; iPad mini 3; iPad mini 2; iPad mini; iPod Touch 6th Generation; iPod Touch 5th Generation; iPod Touch 4th Generation; iPod Touch 3rd Generation; iPod Touch 2nd Generation; iPod Nano 7th Generation; Apple Watch, Series 4; Apple

Watch Series 3; Apple Watch Nike+; Apple Watch Hermes; Apple Watch Series 2; Apple Watch Series 1; Apple TV 5th Generation; Apple TV 4th Generation; Apple TV 3rd Generation; Apple TV 2nd Generation; Apple TV 4K; AirPort Extreme; MacBook; MacBook Pro; MacBook Air; iMac Pro; Mac Mini; iMac; Mac Pro; Beats Solo2 Wireless Headphones; Beats Studio Wireless Headphones; Beats PowerBeats3 Wireless In-Ear Headphones; Beats PowerBeats2 Wireless In-Ear Headphones; AirPods; Beats Pill+ Wireless Speaker; Beats Pill Wireless Speaker; Beats Pill XL Wireless Speaker; Beats Studio3 Wireless; Beats Solo3 Wireless Headphones; BeatsX Earphones; Powerbeats3 Wireless Earphones; HomePod; and all other devices that use Bluetooth EDR.

30.     Apple's Bluetooth EDR Products satisfy the limitations of the claims of the '228 Patent.  For example, each of Apple's Bluetooth EDR Product is a "master communication device" that can operate in the role of the master in a master-slave relationship and communicate with other Bluetooth EDR Products operating in the role of slaves.  Further, each of Apple's Bluetooth EDR Products can transmit using at least two "different types" of modulation methods: (1) a "first" Gaussian Frequency Shift Keying (GFSK) modulation method; and (2) a "second" Differential Phase Shift Keying (DPSK) modulation method.  Each of Apple's Bluetooth EDR Products can transmit a "first message" in the form of a Basic Rate packet (with a GFSK access code/header and a GFSK payload) and a "second message" in the form of an Enhanced Rate packet (with a GFSK access code/header and a DPSK payload).  Further, the access code/header of both messages includes "first message address data" comprising an LT_ADDR field.

31.     Upon information and belief, at least as of the filing of this complaint, Apple also indirectly infringes claim 21 of the '228 Patent by active inducement under 35 U.S.C. § 271(b).

Apple has induced, caused, urged, encouraged, aided and abetted its direct and indirect customers to make, use, sell, offer for sale and/or import and export products which are interoperable according to the Bluetooth EDR Specifications and thereby infringe the '228 Patent. Apple has done so by acts including but not limited to selling products that are interoperable according to the Bluetooth EDR Specifications to their customers; marketing the infringing capabilities of such products; and providing instructions, technical support and other support and encouragement for the use of such products. Such conduct by Apple was intended to and actually resulted in direct infringement, including the making, using, selling, offering for sale and/or importation and exportation of infringing Apple Bluetooth EDR Products into and out of the United States. Apple has notice of the '228 Patent by at least the date of this complaint but, upon information and belief, Apple knew of the '228 Patent far earlier as a result of Apple following and/or press coverage of Rembrandt's prior litigation asserting the '228 Patent against Samsung (Apple's biggest competitor), or based on information learned from its vendor, Broadcom Inc., which also supplied Bluetooth products to Samsung.

32.    The acts of infringement by Apple have caused damage to Rembrandt, and Rembrandt is entitled to recover from Apple the damages sustained by Rembrandt as a result of Apple's wrongful acts in an amount subject to proof at trial. Specifically, Rembrandt seeks damages for Apple's infringement of the '228 Patent from its date of issuance, June 4, 2013, until the date that Samsung became licensed to the '228 Patent and became obligated to mark its licensed products with the '228 Patent number, which occurred on August 27, 2018.

33.    Upon information and belief, since at least the filing of this lawsuit, Apple's aforementioned actions have been, and continue to be, committed in a knowing and willful manner and constitute willful infringement of the '228 Patent.

## INFRINGEMENT OF U.S. PATENT NO. 8,023,580

34.     On September 20, 2011, United States Patent No. 8,023,580 was duly and legally issued for inventions entitled "System and Method of Communication Using at Least Two Modulation Methods." The '580 Patent claims priority back through a string of continuation applications to US Application No. 09/205,205, which was filed on December 4, 1998, and to Provisional Application No. 60/067,562, filed on December 5, 1997.  Thus, each of the asserted claims of the '580 Patent are entitled to a priority date of December 5, 1997.  The '580 Patent expired on December 4, 2018, but Rembrandt is entitled to damages for infringement that occurred prior to the expiration of the '580 Patent. Rembrandt was assigned the '580 Patent and continues to hold all rights and interest in the '580 Patent, including the right to recover damages for past infringement.  A true and correct copy of the '580 Patent is attached hereto as Exhibit B.

35.     The '580 Patent shares the same specification as the '228 Patent.  Accordingly, the above statements in paragraphs 9-26 above apply equally to the '580 Patent, and Rembrandt incorporates them by reference herein.

36.     Upon information and belief, Apple has infringed directly and indirectly and continues to infringe directly and indirectly claims 2 and 59 of the '580 Patent.  The infringing acts include, but are not limited to, the manufacture, use, sale, importation, and/or offer for sale of Apple Bluetooth EDR Products that practice any of the Bluetooth EDR Specifications (as those terms are defined above for the '228 Patent).

37.     Apple's Bluetooth EDR Products satisfy the limitations of the claims of the '580 Patent.  For example, each of Apple's Bluetooth EDR Product is a "communication device" that can operate in the role of the master in a master-slave relationship and communicate with other Bluetooth EDR Products operating in the role of slaves.  Further, each of Apple's Bluetooth

EDR Products can transmit using two "different types" of modulation methods: (1) a "first" Gaussian Frequency Shift Keying (GFSK) modulation method; and (2) a "second" Differential Phase Shift Keying (DPSK) modulation method.  Each of Apple's Bluetooth EDR Products can transmit a "first sequence" with a GFSK access code/header whose LT_ADDR and TYPE fields indicate the modulation method of a "second sequence" comprising a packet payload. Depending on the "first sequence," the "second sequence" will have either a GFSK payload (in the case of a Basic Rate packet) or a DPSK payload (in the case of an Enhanced Rate packet). Further, after transmitting an Enhanced Rate packet, each of Apple's Bluetooth EDR Products can subsequently transmit a Basic Rate packet with a payload communicating using the first GFSK modulation method.

38.    Upon information and belief, at least as of the filing of this complaint, Apple also indirectly infringes claims 2 and 59 of the '580 Patent by active inducement under 35 U.S.C. § 271(b).  Apple has induced, caused, urged, encouraged, aided and abetted its direct and indirect customers to make, use, sell, offer for sale and/or import products which are interoperable according to the Bluetooth EDR Specifications and thereby infringe the '580 Patent.  Apple has done so by acts including but not limited to selling products that are interoperable according to the Bluetooth EDR Specifications to their customers; marketing the infringing capabilities of such products; and providing instructions, technical support and other support and encouragement for the use of such products.  Such conduct by Apple was intended to and actually resulted in direct infringement, including the making, using, selling, offering for sale and/or importation of infringing Apple Bluetooth EDR Products in the United States.  Apple has notice of the '580 Patent by at least the date of this complaint but, upon information and belief, Apple knew of the '580 Patent far earlier as a result of Apple following and/or press coverage of

Rembrandt's prior litigation asserting the '580 Patent against Samsung (Apple's biggest competitor), or based on information learned from its vendor, Broadcom Inc., which also supplied Bluetooth products to Samsung.

39.    The acts of infringement by Apple have caused damage to Rembrandt, and Rembrandt is entitled to recover from Apple the damages sustained by Rembrandt as a result of Apple's wrongful acts in an amount subject to proof at trial. Specifically, Rembrandt seeks damages for Apple's infringement of the '580 Patent from the date by which Rembrandt disclaimed claims 32, 34, 40, 43, and 44, which occurred on December 4, 2014, until the date that Samsung became licensed to the '580 Patent and became obligated to mark its licensed products with the '580 Patent number, which occurred on August 27, 2018.

40.    Upon information and belief, since at least the filing of this lawsuit, Apple's aforementioned actions have been, and continue to be, committed in a knowing and willful manner and constitute willful infringement of the '580 Patent.

## REMBRANDT AND THE PATENTS-IN-SUIT

41.    Rembrandt has diligently protected the inventions in the patents-in-suit.  For example, Rembrandt sought to obtain licenses from Apple competitors Samsung and BlackBerry, and it was engaged in litigation against both Samsung and Blackberry, including a jury trial against Samsung and a subsequent appeal brought by Samsung after the jury verdict in favor of Rembrandt.  Ultimately, both Samsung and BlackBerry took a license and/or a release to the '228 and '580 Patents.  Prior to Samsung obtaining a license, a jury found Samsung liable for infringing the '228 and '580 Patents based on Samsung's use of Bluetooth EDR, and awarded past-damages of $15.7 million, which constituted a royalty rate of approximately 5 ½ cents per

infringing unit.  The Federal Circuit affirmed the finding that Bluetooth EDR infringed the '228 and '580 Patents.

42.    The value of the patents-in-suit is further demonstrated by their repeated success against validity challenges.  The claims were construed in the prior litigation after a Markman hearing.  After a week-long trial, a jury found that all the asserted claims were valid.  The Federal Circuit affirmed that finding that the '228 and '580 Patents were valid and infringed by Samsung, and that the claim construction was legally correct.  Moreover, the United States Patent & Trademark Office refused to even institute *inter partes* reviews against claim 21 of the '228 Patent and claims 2 and 59 of the '580 Patent.  And the United States Patent & Trademark Office recently confirmed the validity of claim 21 of the '228 Patent and claims 2 and 59 of the '580 Patent in the course of *ex parte* reexamination challenges instituted by Samsung.  In sum, the validity of the asserted claims of the '228 and '580 Patents has been reconfirmed in the course of a jury trial and subsequent appeal, and in post-trial proceedings at the US Patent & Trademark Office .

## JURY DEMAND

43.    Rembrandt hereby demands a trial by jury on all issues.

## PRAYER FOR RELIEF

WHEREFORE, Rembrandt requests entry of judgment in its favor and against Apple as follows:

a)    A declaration that Apple has infringed and is infringing U.S. Patent Nos. 8,457,228 and 8,023,580;

b)    A declaration that Apple's infringement was willful;

c)      An award of damages to Rembrandt arising out of Apple's infringement of U.S.

Patent Nos. 8,457,228 and 8,023,580, including enhanced damages pursuant to 35

U.S.C. § 284, together with prejudgment and post-judgment interest, in an amount

according to proof;

d)      An award of attorneys' fees pursuant to 35 U.S.C. § 285 or as otherwise permitted

by law; and,

e)      Granting Rembrandt its costs and further relief as the Court may deem just and

proper.

Dated:  January 24, 2019                        Respectfully submitted,

 */s/ Eric J. Enger*
Michael F. Heim (Texas Bar No. 09380923)
mheim@hpcllp.com
Eric J. Enger (Texas Bar No. 24045833)
eenger@hpcllp.com
Christopher M. First (Texas Bar No. 24095112)
cfirst@hpcllp.com
Blaine A. Larson (Texas Bar No. 24083360)
blarson@hpcllp.com
**HEIM, PAYNE & CHORUSH, L.L.P.**
1111 Bagby St., Suite 2100
Houston, Texas 77002
Telephone: (713) 221-2000
Facsimile: (713) 221-2021

Demetrios Anaipakos (Texas Bar No. 00793258)
danaipakos@azalaw.com
Amir Alavi (Texas Bar No. 00793239)
aalavi@azalaw.com
Alisa Lipski (Texas Bar No. 24041345)
Email: alipski@azalaw.com
Kyril Talanov (Texas Bar No. 24075139)
Email: ktalanov@azalaw.com
**AHMAD, ZAVITSANOS, ANAIPAKOS,
ALAVI & MENSING, P.C.**
1221 McKinney Street, Suite 3460

Houston, TX 77010
Telephone: 713- 655-1101
Facsimile: 713-655-0062

T. John Ward, Jr., (Texas Bar No. 00794818)
jw@wsfirm.com
Claire Abernathy Henry (Texas Bar No. 24053063)
claire@wsfirm.com
**WARD & SMITH LAW FIRM**
1127 Judson Rd, Ste. 220
Longview, Texas 75601
Telephone (903) 757-6400
Facsimile (903) 757-2323

***Attorneys for REMBRANDT WIRELESS
TECHNOLOGIES, LP***